**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DANIEL BORDEAUX, ) | |
| ) | CASE NO.    1:10-cv-00844 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE JOHN R. ADAMS |
| ) | |
| ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff Daniel Bordeaux ("Bordeaux") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and REMANDED for further proceedings consistent with this Report and Recommendation.

**I. Procedural History**

On November 16, 2006, Bordeaux filed an application for POD, DIB and SSI alleging a disability onset date of November 4, 2006.  His application was denied both initially and upon reconsideration.  Bordeaux timely requested an administrative hearing.

On July 20, 2009, an Administrative Law Judge ("ALJ") held a hearing during which Bordeaux, represented by counsel, testified.  Edith Edwards testified as an impartial vocational

expert ("VE"). On July 28, 2009, the ALJ found Bordeaux was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

*Personal and Vocational Evidence*

Age thirty-seven (37) at the time of his administrative hearing, Bordeaux is a "younger" person under social security regulations. *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). Bordeaux has a high school education and past relevant work as an assembler and landscape laborer. (Tr. 18.)

*Relevant Medical Evidence (Mental)*

On October 11, 2006, Bordeaux began treatment with James Chillcott, M.D.[1] (Tr. 475.) Bordeaux told Dr. Chillcott that he had been suffering from depression for about a year. *Id*. He complained of trouble sleeping, low energy, low ambition, decreased enjoyment of life, decreased appetite, and rated his mood as a 5 or 6 out of 10. *Id*. Dr. Chillcott prescribed Lexapro. *Id*.

On November 14, 2006, Dr. Chillcott again saw Bordeaux, who noted some improvement in his mood after taking Lexapro. (Tr. 471.) Bordeaux exhibited normal affect, no impairment of thought content or process, and no hallucinations or delusions. *Id*. Dr. Chillcott added Wellbutrin to Bordeaux's medications. *Id*.

On December 12, 2006, Bordeaux had a follow-up visit with Dr. Chillcott, and complained that the prescribed medications, Lexapro and Wellbutrin, were completely ineffective. (Tr. 470.) He rated his mood as a 1 or 2 out of 10. *Id*. Dr. Chillcott switched Bordeaux's medication to Cymbalta. *Id*.

On December 22, 2006, at the request of the State Agency, John Spiesman, Ed.D., LSW, completed Mental Status and Daily Activities Questionnaires. (Tr. 230-34.) It was noted that

---

[1] Dr. Chillcott appears to be Bordeaux's general physician and not a mental health specialist. As such, he also treated Bordeaux for numerous physical ailments, which have purposely been omitted from this recitation of Bordeaux's mental health history.

Bordeaux had very poor stress tolerance, and had been fired or disciplined in the past for "anger – work related anxiety, inability to cope w/ others." (Tr. 233.) Bordeaux had a "short temper and ability to tolerate stress." (Tr. 230.) His mood and affect were "quite variable," but his appearance and speech were normal. *Id.*

On January 22, 2007, Dr. Chillcott noted that a Zung questionnaire completed that day was indicative of severe depression.[2] (Tr. 467.) Bordeaux's prescription was changed from Cymbalta to Effexor.

On February 9, 2007, psychologist Richard Halas, M.A., prepared a confidential psychological report at the request of the State Agency. (Tr. 309-14.) Halas made the following observations about Bordeaux:

- He was oriented in all three spheres, was cooperative, and appropriately motivated during the interview and mental status testing. (Tr. 309.)

- His most unusual and concerning behavior was a flat, hesitant, and tentative presentation. *Id.*

- He was neither impulsive nor compulsive, and tended to minimize or deny his problems. *Id.*

- His speech pattern was slow with articulation errors, though it was 95 percent understandable. *Id.*

- He did not exhibit fragmentation of thought or flight of idea, but the relevancy of his responses reflected a significant degree of limitation. (Tr. 310.)

- He had marked poverty of speech with no specific evidence of perseveration of response. *Id.*

- He reported temper tantrums and crying spells, neither of which were observed during the appointment. *Id.*

- His "psychomotor activity during [the] examination reflected retardation." *Id.*

- He admitted to feelings of hopelessness, helplessness and worthlessness, but denied experiencing feelings of guilt. *Id.*

- He exhibited only low levels of anxiety during his appointment and did not show any apprehensive or phobic behaviors. *Id.*

- He was not actively hallucinatory and did not have any additional symptoms or

---

[2] Dr. Chillcott noted that an earlier Zung questionnaire was indicative of mild to minimum depression. (Tr. 467.)

characteristics that would be consistent with a thought disorder or psychotic process. *Id.*

- His long-term and short-term memory were intact, he was unable to perform simple calculations, and he could not understand simple proverbs. (Tr. 311.) His general intelligence was estimated to be in the low average range. *Id.*

Halas administered a Wechsler Adult Intelligence Scale III exam, which indicated that Bordeaux's verbal and full scale IQs are in the low average range of intellectual functioning.[3] (Tr. 312.) Halas diagnosed depressive disorder not otherwise specified and ascribed a Global Assessment of Functioning ("GAF") score of 55.[4] (Tr. 313.) Halas opined that Bordeaux was moderately limited in his ability to relate to peers, supervisors, and the general public; mildly limited in his ability to follow through with simple one and two step instructions or directions and to withstand the stresses and pressures associated with work[5]; and his ability to maintain attention to do simple and repetitive tasks was intact. *Id.*

On February 20, 2007, Bonnie Katz, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment to determine whether Bordeaux met Listing 12.04 – Affective Disorders. (Tr. 319-36.) She concluded Bordeaux has a depressive disorder no otherwise specified, which does not precisely satisfy the diagnostic criteria for Affective Disorders. (Tr. 322.) She further found that Bordeaux exhibits mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 329.) Dr. Katz found that Bordeaux's statements as to the severity of his symptoms were only partially credible. (Tr. 335.) She concluded that Bordeaux's "symptoms are severe enough to

---

[3] Bordeaux's full scale IQ was 87, a score in the 19th percentile of the general population. (Tr. 312.)

[4] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (Am. Psychiatric Ass'n., 4th ed. revised, 2000).

[5] Halas asserted that Bordeaux's depressive symptoms would be exacerbated if he was placed in a stressful, fast-paced, and demanding work setting. (Tr. 313.)

pose a limitation, but not severe enough to prevent work-related activity that is simple to somewhat complex in nature, in an environment with minimal contact with his coworkers and supervisors and the public. He can make simple decisions and deal with changes in routine." *Id*. However, Bordeaux's symptoms "prevent him from sustaining close, consistent attention to detail." *Id*.

On February 22, 2007, Bordeaux told Dr. Chillcott that his mood was stable on Effexor. (Tr. 464.)

Bordeaux was seen by Dr. Chillcott in April, May, and June of 2007, but none of those visits contain complaints regarding depression. (Tr. 443, 448, 454.)

On August 27, 2007, Bordeaux, accompanied by his mother, visited Dr. Chillcott. (Tr. 442.) Dr. Chillcott noted that Bordeaux's mother was a mental health professional at North Coast. *Id*. She indicated that he had problems with anger and irritability, and that his mood had been progressively worse. *Id*. Dr. Chillcott increased the dosage of Bordeaux's Topamax medication, and noted that he was reluctant to prescribe Lithium, as he feared it could trigger diabetes. *Id*.

On October 2, 2007, Dr. Chillcott noted that Bordeaux is suspected of having bipolar disorder in addition to depression. (Tr. 440.) He increased the dosage of Topamax again, and noted that Bordeaux had suddenly stopped taking his Effexor after running out ten days earlier. *Id*. Bordeaux reported being less irritable and denied suicidal ideation. *Id*.

Bordeaux was seen by Dr. Chillcott in November and December of 2007, but no complaints regarding depression were recorded. (Tr. 438-39.)

On January 14, 2008, Dr. Chillcott noted that depression inventory indicated moderate to marked depression with impulse control disorder after he administered a Zung questionnaire. (Tr. 436.) Bordeaux was negative for bipolar disorder. *Id*. Bordeaux's wife was concerned because he had been very aggressive, agitated and he had become "physical." *Id*. Bordeaux was instructed to go to the emergency room ("ER") if at anytime he felt he was at risk of harming

5

himself or others.[6]  *Id*.

On February 19, 2008, Dr. Chillcott noted Bordeaux's history of depression and noted that Dr. Lederman prescribed Keppra.  (Tr. 583.)

During visits on May 19 and May 28 of 2008, no discussion of Bordeaux's depression was recorded.  (Tr. 574, 582.)

On June 11, 2008, Bordeaux was taken to the ER by his wife after he threatening to kill himself in front of her.  (Tr. 641.)  A mental status examination performed by Khoa Tran, M.D., revealed major depressive disorder, mild psychomotor retardation, intact cognition, and no delusions or paranoia.  *Id*.  Bordeaux also denied suicidal ideation at that time.  *Id*.  Bordeaux was ascribed a GAF score of 20.  *Id*.  He was hospitalized, but discharged the next day.  (Tr. 645.)

On July 28, 2008, Bordeaux was referred to psychiatrist Sabjot Ajit, M.D., whom he began to see one or twice per month.  (Tr. 523-536.)  On that date, he was assigned a GAF score of 47.  (Tr. 536.)  Throughout the remainder of 2008 and the beginning of 2009, Bordeaux was routinely assessed with mood disorder.  *Id*.  Dr. Ajit also routinely found that Bordeaux had no delusions, no suicidal/homicidal ideations, and no hallucinations.  *Id*.  During these visits, Bordeaux was alert, oriented, with depressed or dysphoric mood and congruent affect.  *Id*.  He also exhibited linear, coherent, and logical thought, with ruminative content.  *Id*.   Bordeaux frequently stated that he would sometimes forget to take his medications.  *Id*.

On August 15, 2008, Bordeaux stated that he was irritable, mildly depressed, and had difficulty controlling his anger.  (Tr. 535.)  He denied any side effects from his medications.  *Id*.  Dr. Ajit found Bordeaux was negative for attention deficit hyperactivity disorder ("ADHD").  *Id*.

On August 28, 2008, Bordeaux stated to Dr. Ajit that he was doing better overall on Invega until stressors related to his daughter arose.  (Tr. 534.)  Dr. Ajit increased the dosage of Invega.  *Id*.

---

[6] Dr. Chillcott noted that Bordeaux was also being seen by Dr. Lederman, a neurologist, who would be adjusting Bordeaux's prescriptions.  (Tr. 436.)

On September 5, 2008, Bordeaux stated that his irritability and anxiety had improved on Invega, but, after running out, he experienced increased depression, agitation, and anxiety. (Tr. 533.)  Dr. Ajit discontinued Invega and instead prescribed Abilify. *Id*.

On October 15, 2008, Dr. Ajit assessed mood disorder. (Tr. 531.)  After going through an ADHD questionnaire, Bordeaux was positive for ADHD symptomatology complex. *Id*.  Dr. Ajit adjusted Bordeaux's prescriptions. *Id*.

On November 18, 2008, Dr. Ajit assessed mood disorder and ADHD, with underlying impulse control disorder. (Tr. 530.)  He discontinued Bordeaux's prescriptions for Lorazepam and Topamax, but continued to prescribe Concerta, Abilify, and Effexor. *Id*.

On December 9, 2008, Dr. Ajit assessed mood disorder, and noted that Bordeaux was "alert, oriented, cooperative, tired, fatigued, pale." (Tr. 529.)  He started Bordeaux on Ciproflaxacin. *Id*.

On January 7, 2009, Dr. Ajit discontinued Bordeaux's prescriptions for Abilify and Effexor, but increased the dosage of Topamax. (Tr. 528.)

On January 21, 2009, Dr. Ajit assessed mood disorder, and noted that Bordeaux had a degree of Alexithymia, as he was unable to express his emotional state except to say that he was irritable. (Tr. 525.)  He increased the dosage of Bordeaux's medications, Topamax and Concerta. *Id*.  He noted that Bordeaux was seeing a counselor. *Id*.

On March 5, 2009 and March 12, 2009, Dr. Ajit assessed mood disorder and ADHD. (Tr. 523, 524.)  Bordeaux indicated that his symptoms were exacerbated since being off the Effexor. (Tr. 524.)  Dr. Ajit continued to prescribe Topamax and restarted Effexor. *Id*.

On June 15, 2009, Dr. Ajit completed a Residual Functioning Capacity ("RFC") questionnaire in which Bordeaux was ascribed a GAF score of 41.[7] (Tr. 654.)  His highest GAF score in the past year was listed as 50. *Id*.  Dr. Ajit indicated that Bordeaux suffered from

---

[7] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

dysthmic disorder, mood disorder, borderline intellectual functioning. *Id.* At that time, he was prescribed only Topamax. *Id.* Dr. Ajit's clinical findings are difficult to read, but they appear to indicate that he believed Bordeaux had "poor insight," "impaired executive functioning," and "poor impulse." *Id.* Dr. Ajit indicated that Bordeaux had the following symptoms; amedonia or pervasive loss of interest in almost all activities, appetite disturbance and weight change, decreased energy, feelings of guilt or worthlessness, impairment of impulse control, generalized persistent anxiety, mood disturbance, pathological dependence, apprehensive expectation, seclusiveness, emotional withdrawal or isolation, motor tension, emotional lability, deeply ingrained, maladaptive patterns of behavior, easy distractability, and memory impairment. (Tr. 655.)

As for Bordeaux's mental abilities and aptitudes for work, Dr. Ajit found that Bordeaux is seriously limited, but not precluded from understanding, remembering, and carrying out very short and simple instructions or from interacting appropriately with the general public. (Tr. 656-57.) He is also unable to meet competitive standards in the following areas: remembering work-like procedures, understanding and remembering detailed instructions, sustaining an ordinary routine without special supervision, asking simple questions or requesting assistance, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, traveling in unfamiliar places, and using public transportation. *Id.* Finally, Dr. Ajit opined that Bordeaux has no useful ability to function in an additional thirteen categories. *Id.* Dr. Ajit checked a box indicating that Bordeaux had a "[m]edically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support." (Tr. 658.) Dr. Ajit also found *all* of the following: three or more episodes of decompensation within twelve months, each at least two weeks long, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, and a current history

8

of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. *Id.*

*Relevant Hearing Testimony*

At the hearing, Bordeaux testified to the following:

- He is married and has three children. (Tr. 26.)
- He completed the 12th grade, but attended all special education classes. (Tr. 27.)
- He can read and write, but not very well. *Id.*
- He was terminated from his last job after a heated argument with a fellow employee. (Tr. 29.)
- He spent two weeks in the hospital a year earlier due to emotional problems. (Tr. 33-34.)
- He has no friends and constantly argues with his wife. (Tr. 35.)
- He attempted suicide in June of 2008. (Tr. 38.)
- At one point, he was taking as many as twenty-five (25) medications a day, but he stopped taking them because they made him sick. (Tr. 39.)

The ALJ posed the following hypothetical to the VE:

> I'd like for you to assume a person with the same age, education, work background as Mr. Bordeaux. I'd like you to assume that that individual could perform light work provided that it did not require any constant, repetitive handling or fingering, would not expose the individual to any excessive environmental conditions including dust, odors, fumes and gases and would be limited to occasional contact with coworkers, supervisors and the public, with only simple, routine, one and two-step processes. Would there be any light or sedentary, unskilled work?

(Tr. 49.) The VE testified that, at the light level, such a person would be limited to the position of unarmed security guard, 3,750 jobs in Ohio and 100,000 nationally. (Tr. 50.) At the sedentary level, the VE stated that such person could perform the job of a surveillance system monitor, 3,120 locally and 83,300 nationally. *Id.*

### III. Standard for Disability

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

9

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[8]

Bordeaux was insured on his alleged disability onset date, November 4, 2006, and remained insured through the date of the ALJ's decision, July 28, 2009. (Tr. 12.) Therefore, in order to be entitled to DIB, Bordeaux must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Bordeaux established medically determinable, severe impairments, due to: "sarcoidosis; bilateral upper extremity disorder (status post (s/p) left ulnar surgery); neck disorder; and mood disorder." (Tr. 12.) However, his impairments, either singularly or in

---

[8] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Bordeaux was found incapable of performing his past work activities, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 16-18.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Bordeaux is not disabled.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

### VI. Analysis

Bordeaux claims the ALJ erred by: (1) failing to adequately explain the reasons for rejecting the opinions of his treating physicians; and, (2) failing to find that he met Listing 12.04. (Doc. No. 8.)

*Treating Physicians*

Bordeaux argues that the ALJ failed to give appropriate weight to the opinion of his treating psychiatrist, Dr. Ajit, and erred by failing to adequately explain the reasons for rejecting his opinion.[9] (Doc. No. 8.) The Commissioner argues that the ALJ properly assessed the medical source opinions of record, including those of Dr. Ajit and Dr. Chillcott. (Doc. No. 9.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)); accord 20 C.F.R. § 416.927. "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to

---

[9] Bordeaux's brief also references Dr. Chillcott's opinions, though primarily as being supportive of or consistent with Dr. Ajit's opinion. (Doc. No. 8 at 8-9.)

12

deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408; accord .[10]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 416.927(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

With respect to the opinions of Dr. Ajit and Dr. Chillcott, the ALJ's opinion contains the following discussion:

---

[10] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

> The undersigned considered Dr. Sarbjot Ajit's June 15, 2009 opinion finding the claimant's depression disabling, and gives it little weight. Although a treating source, his findings are not supported by the conservative treatment history, medications prescribed, or the record as a whole. (Exhibits 21F and 35F).
>
> \*\*\*
>
> Dr. Chillcott, the claimant's primary care physician, treated the claimant for depression since October 2006 with a variety of drugs. Dr. Chillcott is not a mental health provider and his opinion regarding the claimant's mental limitations are given only limited weight.

(Tr. 17-18.)

The inadequacy of the ALJ's opinion is highlighted by the Commissioner's brief. Rather than focusing on the ALJ's actual opinion wherein the treating physician's opinions were rejected, the Commissioner cites portions of the medical record that potentially support the ALJ. (Doc. No. 9 at 14-16.) However, the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ. As this Court has previously noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Bable v. Astrue*, 2007 U.S. Dist. LEXIS 83635, 27-28 (N.D. Ohio, Oct. 31, 2007) (*citing NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 715, n.1, (2001)); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *cf. Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106, 1113 (6th Cir. 1986) (rejecting Defendant's *post hoc* rationale that obesity is *per se* remediable where there was no factual basis or findings of fact in the record to support such an argument).

The ALJ's own reasons for not ascribing either controlling weight or greater weight to Dr. Ajit's opinions are legally insufficient. The ALJ's finding that Dr. Ajit's opinion was not supported by his "conservative treatment history" or "the medications prescribed" appears to be

14

the personal opinion of the ALJ.[11]  ALJ's are not trained medical experts and it is well-established that they may not substitute their own opinion for that of a medical professional. *See, e.g., Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (*citing McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6th Cir. 2003) (citation omitted); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2nd Cir. 1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'"); *Stallworth v. Astrue*, 2009 WL 2271336 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.") (*quoting Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)).

Moreover, this Court cannot discern why the ALJ gave the treating physician's opinion such minimal weight.  *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004).  The ALJ's conclusory opinion does not offer an explanation of why the opinions of Dr. Ajit and Dr. Chillcott were given little weight.  Based on the ALJ's brief statement, this Court cannot fulfill its function and conduct a meaningful review.  It is unclear how the medications prescribed by the treating physicians undercut their opinion or why the ALJ construes the treatment as conservative.  Though the ALJ points out that Dr. Chillcott was not a

---

[11] While the record contains repeated statements that Bordeaux did not always take his medications or that he forgot to take them regularly, the ALJ did not find that Bordeaux failed to comply with treatment pursuant to 20 C.F.R. § 404.1530.

mental health specialist, the same cannot be said of Dr. Ajit. While a doctor's specialty may be a factor in how much weight to ascribe an opinion, the mere fact that Dr. Chillcott is not a mental health specialist does not adequately explain why his opinion was given only limited weight. Moreover, the statement that Dr. Ajit's opinion is not supported by "the record as a whole" is meaningless without further explanation. Ultimately, it is unclear how the ALJ arrived at his decision. As such, Bordeaux's first assignment of error is well taken and this matter should be remanded for a new decision that adequately explains the weight accorded to the various medical sources of record in compliance with 20 C.F.R. § 404.1527.

*Listing 12.04*

Bordeaux also argues that this Court should award benefits because, based on Dr. Ajit's opinion, Listing 12.04 is satisfied. The Court declines to do so. This report and recommendation should not be construed as compelling the conclusion that Dr. Ajit's opinion should be afforded controlling weight. Rather, the ALJ is free to assign any weight to his opinion so long as the finding is adequately explained, supported by substantial evidence, and in compliance with all applicable rules and regulations.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision of the Commissioner should be VACATED and the case REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

s/ Greg White<br>United States Magistrate Judge

Date: March 7, 2011

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**